[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 200 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 201 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 202 
The appellant, David Kevin Hocker, was convicted of capital murder for the killing of Jerry Wayne Robinson. The murder was made capital because the appellant committed it during the course of a first-degree robbery.See § 13A-5-40(a)(2), Ala. Code 1975. After a sentencing hearing, the jury recommended, by a vote of 10-2, that the appellant be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to death. The appellant filed a motion for a new trial, which the trial court denied after conducting a hearing. This appeal followed.
Because the appellant does not challenge the sufficiency of the evidence to support his conviction, a lengthy recitation of the facts of the case is not necessary. However, we have reviewed the evidence, *Page 203 
and we find that it is sufficient to support the appellant's conviction. The following summary of the relevant facts, as prepared by the trial court, may be helpful to an understanding of this case:
 "The victim, Jerry Wayne Robinson, owned a small business in Houston County, Alabama. The Defendant David Kevin Hocker worked for Mr. Robinson. They were together on March 21, 1998 and were seen by the victim's wife at West Building Supply in Dothan, Alabama. That would be the last time she saw her husband alive. The next time she saw him was at the funeral home when she identified his body.
 "Sergeant Donald Valenza of the Houston County Sheriff's Department received a call from the Mobile County Sheriff's Department informing him that Mobile had the Defendant Hocker in custody. He had confessed to Mobile authorities that he had murdered Jerry Robinson. Sergeant Valenza went to Mobile and took a statement from Hocker at which time Hocker admitted to killing Jerry Robinson by stating that he had broken a knife off in his chest. Sergeant Valenza transported Hocker back to Houston County, Alabama, and made arrangements with the Headland Police Department to locate the body. Hocker took the officers to the body which was located in Henry County, Alabama. The body contained a single stab wound to the chest with the . . . blade imbedded in Jerry Robinson's chest. There were numerous cuts, abrasions and other injuries.
 "Upon further investigation and the Defendant's statement it was learned that Jerry Robinson and Hocker had gone to West Building Supply to purchase materials to build a fence. Hocker later dumped the building materials in a ditch. He had intended to kill Jerry Robinson at his office but a co-owner was present. By ruse, Hocker talked Jerry Robinson into going with him to Henry County to pick up a microwave oven. While in the truck Hocker stabbed Jerry Robinson in the chest, drove to a remote area and dragged Jerry Robinson from the vehicle. Hocker then proceeded to beat and stomp Jerry Robinson causing over thirty contusions, scrapes and cuts. Jerry Robinson's Adam's apple was broken. There was a fracture of the thyroid cartilage. According to the forensic pathologist, Dr. Parades, Jerry Robinson remained alive during this vicious beating and was able to feel pain. However, the stab wound to the chest was the lethal wound.
 "Hocker stole Jerry Robinson's green truck, ATM card and cash. After several withdrawals through the victim's ATM card Hocker purchased $400.00 in crack cocaine and then drove to Mobile, Alabama. While on crack he believed the police were chasing him and he abandoned the truck and ran through the woods causing numerous scratches to his face. Hocker later rented a motel room in Mobile and called 911 to turn himself in. He subsequently gave statements to the Mobile County Sheriff's Department and Sergeant Valenza confessing to the crime.
 "In his statements Hocker claimed that the victim made sexual advances towards him which caused him to stab the victim. However, three witnesses testified that Jerry Robinson was not homosexual. He was a married man with two children."
(C.R. 191-93.) Additional facts are included, as necessary, throughout this opinion.
The appellant raises some issues on appeal that he did not raise at trial. *Page 204 
Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy,472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340,88 L.Ed.2d 325 (1985). Rule 45A, Ala.R.App.P., provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review . . . whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1,15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v.Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14,71 L.Ed.2d 816, 827 n. 14 (1982)).
 I.
The appellant's first argument is that the trial court improperly denied his motion for a change of venue. In support of his argument, he asserts that he "introduced over fifty pages of exhibits showing the nature and extent of pretrial publicity involving this case." (Appellant's brief at p. 17.)
 "`A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App. 1983).'
 "Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App. 1994)."
Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App. 1996), aff'd,720 So.2d 985 (Ala. 1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907,142 L.Ed.2d 906 (1999). "The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather,Ex parte Grayson[, 479 So.2d 76 (Ala. 1985), cert. denied, 474 U.S. 865,106 S.Ct. 189, 88 L.Ed.2d 157 (1985)] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity." Slagle v. State, 606 So.2d 193, 195
(Ala.Crim.App. 1992).
 "In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated `actual prejudice' against him on the part of the jurors; 2) when there is `presumed prejudice' resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600
(1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir. 1983)."
Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App. 1993), aff'd,642 So.2d 1060 (Ala. 1994).
 A.
We must first determine whether the pretrial publicity resulted in *Page 205 
"presumptive prejudice." For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Colemanv. Kemp, 778 F.2d 1487 (11th Cir. 1985), cert. denied, 476 U.S. 1164,106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). Under this standard, a defendant carries an extremely heavy burden of proof.
 "Hunt relies on the `presumed prejudice' standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: `Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.' 778 F.2d at 1490 (emphasis added [in Hunt]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App. 1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
 "In determining whether the `presumed prejudice' standard exists the trial court should look at `the totality of the surrounding facts.' Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is `rarely' applicable, and is reserved for only `extreme situations'. Coleman v. Kemp, 778 F.2d at 1537. `In fact, our research has uncovered only a very few . . . cases in which relief was granted on the basis of presumed prejudice.' Coleman v. Kemp, 778 F.2d at 1490.
 "Hunt had the burden of showing that `prejudicial pretrial publicity' saturated the community. Sheppard, supra. `[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.' Coleman v. Kemp, 778 F.2d at 1537. `Prejudicial' publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. `Publicity' and `prejudice' are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
". . . .
 ". . . In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, `the appellant must show more than the fact "that a case generates even widespread publicity."' Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App. 1993) quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App. 1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
 "`"Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945]."'
 "Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35
(Ala. 1977). *Page 206 
 "A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so `pervasively saturated' with prejudicial publicity so as to make the court proceedings nothing more than a `hollow formality.' Rideau, supra."
Hunt, 642 So.2d at 1043-44. "To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice."United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.), cert. denied,498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).
In support of his motion for a change of venue, the appellant introduced newspaper articles from local newspapers and portions of newscasts by local television stations that covered the case, including information as to the geographic area covered by the media. In its order regarding the appellant's motion, the trial court found as follows:
 "The matter before the Court is Defendant's motion for change of venue filed for record March 29, 1999. It should be noted that CC99-124 is a companion case to CC98-068, which was the original indictment in this case. On May 7, 1999, upon joint motion of the State and Defendant, CC98-068 was remanded back to the next available Henry County grand jury to address certain defects in the indictment. The new indictment for capital murder was returned by a Henry County grand jury on September 22, 1999. Additionally, on June 23, 2000 in response to the Defendant's motion to incorporate, the Court granted the Defendant's motion to incorporate as well as the Court's rulings on these incorporated motions. Therefore references will be made to pleadings in both CC99-124 and CC98-068.
 "An evidentiary hearing was conducted by this Court on April 9, 1999 concerning the Defendant's motion to change venue. The Defendant produced two witnesses: Terry Grimes, editor of the `Headland Observer' which is published once a week. Defendant's exhibits 1 and 2 were `Headland Observer' newspaper articles regarding the crime, with said articles appearing on March 26, 1998 and April 2, 1998. Mr. Grimes testified that there were no other articles printed. Wayne May a senior reporter for WTVY news testified that the case was mentioned over fourteen separate news days appearing several times each day.
 "A supplemental hearing concerning Defendant's motion for change of venue was held June 23, 2000. The Court allowed the Defendant to supplement his previous exhibits with two additional exhibits as part of the evidence on the venue motion. At both hearings the parties and their respective attorneys were present.
 "In the Defendant's motion for change of venue the Defendant alleges that his case has received wide spread publicity and that this adverse publicity has saturated the community to the point he can not receive a fair trial.
 "The Court notes that while this is a capital murder case, this case has received far less publicity than other high profile capital cases tried by this Court (i.e., Hammonds [v. State, 777 So.2d 750
(Ala.Crim.App. 1999)] and Wimberly [v. State, 759 So.2d 568 (Ala.Crim.App. 1999)]. In fact, this case has received *Page 207 
scant attention when compared to others.
 "This venue motion is decided based on the law found in Hunt v. State, 642 So.2d 999 (Ala.Cr.App. 1993); Oryang v. State, 642 So.2d 979 (Ala.Cr.App. 1993); and Hammonds v. State, CR-97-0722 (Ala.Cr.App. 1999), affirmed Ex parte Hammonds, 1990258 (Ala. 2000).
 "The right to a fair and impartial jury is guaranteed by the Sixth Amendment to the United States Constitution which states: `In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . .' This right is also preserved in Article I, Section 6
of the Alabama Constitution of 1901. However, the Defendant has failed to meet his burden in affirmatively showing that pretrial publicity so saturated the community as to have a probable impact on the prospective jurors or that there is a connection between the publicity generated and the existence of actual juror prejudice as determined during trial voir dire. Insofar as this is a capital case and ever mindful of its duty to ensure a fair and impartial trial, the Court will reserve jurisdiction of this matter to such time as a jury venire can be impaneled and a determination be made as to whether or not actual prejudice exists. The Court has much discretion in allowing individual voir dire.
 "Based on the testimony, exhibits and arguments of counsel, IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant's motion for change of venue is denied."
(C.R. 124-26.)
We have examined the materials the appellant presented to the trial court. Based on that review, we find that the reports were factual and relatively objective and were not accusatory, inflammatory, or sensational. Therefore, we conclude that the materials did not contain prejudicial information. Further, the appellant did not establish that the media attention inflamed or saturated the community so that there was an emotional tide against him. Accordingly, he has not shown that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those "extreme situations" that warrant a presumption of prejudice based on pretrial publicity.
 B.
We must also determine whether the jury was actually prejudiced against the appellant.
"The `actual prejudice' standard is defined as follows:
 "`To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].'
"Coleman v. Zant, 708 F.2d at 544."
Hunt, 642 So.2d at 1043.
 "Furthermore, in order for a defendant to show prejudice, the "proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, *Page 208 362 So.2d 1296, 1299 (Ala.Crim.App. 1978).' Ex parte Grayson, 479 So.2d 76, 80 (Ala. 1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)."
Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App. 1993).
The appellant has not shown that the pretrial publicity actually prejudiced him. The jury selection proceedings showed that only six of the veniremembers were familiar with the offense. Of those six veniremembers, the trial court excused four for cause, and the defense peremptorily challenged the remaining two. (C.R. 141-43.) Accordingly, the appellant has not shown that any of the jurors were actually prejudiced against him.
For these reasons, the appellant did not show that the jurors were either presumptively or actually prejudiced against him. Therefore, the trial court did not abuse its discretion in denying the appellant's motion for a change of venue.
 II.
The appellant's second argument is that the trial court improperly denied his motion pursuant to Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), after the State allegedly used its peremptory challenges in a racially discriminatory manner. In his brief to this court, he specifically contends, as he did at trial, that the trial court improperly found that the prosecutor's reasons for striking veniremembers L.B. and M.D. were race-neutral.
After the jury was struck, but before it was sworn, the following occurred:
 "THE COURT: You have a Batson Motion you indicated earlier?
 "[DEFENSE COUNSEL]: Yes, sir. I do. I believe that there were a total of twelve African American Jurors on the Strike Panel. The State exercised nine of its twenty-two [peremptory] challenges against African Americans. I will concede that the Defense exercised one [peremptory] challenge to an African American we seated as an Alternate Juror that we seated in the Box, the last Defendant's strike. The striking of seventy-five percent of the African American members of the Venire, we contend, makes a prima facie case of racially discriminatory exercise under the principles enunciated in Batson VS Kentucky and Ex Parte Thomas.
"THE COURT: Anything else?
"[DEFENSE COUNSEL]: No, sir.
 "THE COURT: Okay. There are two African Americans on the Jury?
"[DEFENSE COUNSEL]: Yes, sir.
"THE COURT: Does that include your Alternate?
"[DEFENSE COUNSEL]: No, sir.
"[PROSECUTOR]: Three, not including the Alternate.
 "THE COURT: So, that makes four if we include the Alternate?
"[DEFENSE COUNSEL]: I stand corrected.
"THE COURT: Is that still —
 "[DEFENSE COUNSEL]: Your Honor, that changes the percentages slightly. It does, however, mean that the State used [peremptory] challenges to remove nine out of thirteen African Americans on the Panel. And, we feel that rises to the level of a prima facie case.
 "THE COURT: Okay. I disagree, but as is my practice, I direct the State to give me its reasons for the strikes of the African Americans."
(R. 290-91.) Thereafter, the prosecutor stated his reasons for exercising his peremptory challenges. *Page 209 
With regard to veniremember L.B., the prosecutor stated:
 "[L.B.], in his answers regarding how you feel about the Death Penalty, appears to waffle back and forth. He wrote, if I can read his writing: Death Penalty only is fair when enough evidence is presented. There has to be no doubt about the judgment. If the evidence is true, I can recommend the Death Penalty. But, if it is not enough evidence, I will not recommend the Death Penalty. On his waffling back and forth there, only fair when enough evidence is presented, has to be no doubt and we talked at some length about reasonable doubt earlier. So, on the answers that he gave to how you feel about the Death Penalty, the State struck him."
(R. 293-94) (emphasis added). With regard to veniremember M.D., the following occurred:
 "[PROSECUTOR]: The next one let's see, [M.D.]. First of all, I will show the Court [M.D.'s] questionnaire. She leaves blank most of Page 2. She left blank where she went to grade school, junior high school. Have you ever served on a Jury? Yes. One time. Rendered a not guilty verdict. I assume because she put innocent there. Every person is a witness. Leaves that blank. Have you, any member of your family, ever known and been accused of a crime. She left that totally blank.
"THE COURT: She left the whole page blank.
 "[PROSECUTOR]: Yes, sir. Except for one part-answer right there that says have you or any member of your family or anyone you know been the victim of a crime and she wrote no. Other than that, it is blank. The next page she left a good bit of it blank. Same thing on the following page, parts of it are blank. And, she did answer the part on the Death Penalty. She put: I feel that if you can't give a life, why take one. I don't understand what that means; if you can't give a life, why take one. So, it appears she is also against the Death Penalty. Also for the Record, Your Honor, we have prosecuted a number of Doziers in this County, specifically on Drug Offenses. I know for a fact [the District Attorney] prosecuted some Doziers and I have prosecuted some Doziers, sons of Doziers and she chose to leave that part blank in her answers. So, based on the fact that she chose not to answer the majority of the questions there and also her answers regarding the Death Penalty, we struck her."
(R. 294-96) (emphasis added). Subsequently, the following occurred:
 "[DEFENSE COUNSEL]: . . . With regard to [L.B.], the State says that there were waffling answers on his questionnaire. Of course, they, like the Defendant, had the opportunity to engage in individual Voir Dire as well as Voir Dire directed to the panel as a whole. And, we feel that any inconsistencies could have been resolved in that fashion. And therefore, it is a pre-textual strike. With regard to [M.D.], the State states that she left a great many pages blank. I think that could be said of a great many people who answered these questionnaires. He comments there are numerous Doziers who have been prosecuted. I am sure there are numerous Smiths who have been prosecuted. Also, again, there was an opportunity to engage — —
"THE COURT: Let me say this — —
 "[DEFENSE COUNSEL]: And, Dozier is not an uncommon name in this area.
 "THE COURT: Let me say something about that argument. I didn't put *Page 210 
much stock in that about the Dozier name. Yes, it could have been asked, but I don't think that was the heart of the State's rationale for that strike.
 "[DEFENSE COUNSEL]: In any event, based on that, we feel that the strike was pre-textual. . . .
 "THE COURT: . . . I find that the State has provided this Court with race neutral reasons for their strikes. They have cited a number of things in the Jury questionnaire. I think you took exception, at least in your rebuttal to [M.D.] and [L.B.].
"[DEFENSE COUNSEL]: Yes, sir.
"THE COURT: Was there any other that you mentioned?
"[DEFENSE COUNSEL]: No, sir.
 "THE COURT: Okay. So, with that, your motion is denied."
(R. 299-302.)
 "In Batson, the United States Supreme Court held that the prosecution violates equal protection when it peremptorily strikes `potential jurors [from the venire] solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.' 476 U.S. at 89, 106 S.Ct. at 1719. After the appellant makes a timely Batson motion and establishes a prima facie showing of discrimination, the burden shifts to the state to provide a race-neutral reason for each strike of a minority veniremember. See, e.g., Ex parte Bird, 594 So.2d 676
(Ala. 1991). We will reverse the circuit court's ruling on the Batson motion only if it is `clearly erroneous.' Jackson v. State, 549 So.2d 616
(Ala.Cr.App. 1989)."
Cooper v. State, 611 So.2d 460, 463 (Ala.Crim.App. 1992). In this case, the defense based its Batson motion solely on the number of black veniremembers the prosecution struck.
 "Alabama courts have recently held that even a showing that [a] party had struck a high percentage of strikes used against a minority was not alone enough. In Ex parte Trawick, 698 So.2d 162, 168 (Ala. 1997), the Alabama Supreme Court held, `Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination.'"
Armstrong v. State, 710 So.2d 531, 533 (Ala.Crim.App. 1997). Because the defense relied solely upon the percentage of blacks struck, we question whether it established a prima facie showing that the prosecutor exercised his peremptory challenges in a discriminatory manner. Nevertheless,
 "[w]here, as in this case, the trial court requires the opposing counsel to state reasons for the peremptory strikes without first requiring that a prima facie case of discrimination be established, this Court will review those reasons and the trial court's ultimate decision on the Batson motion without determining whether the moving party met its burden of proving a prima facie case of discrimination."
Harris v. State, 705 So.2d 542, 545 (Ala.Crim.App. 1997). Accordingly, we will review the prosecutor's reasons for striking veniremembers L.B. and M.D.
The prosecutor indicated that he struck veniremember L.B. based on his noncommittal answers to questions regarding the imposition of the death penalty. He further specifically indicated that he struck veniremember M.D. because she had not answered many of the questions on the jury questionnaire and because she appeared to be opposed to the death penalty. The record supports these explanations. *Page 211 
 "`Although a juror's reservations about the death penalty may not be sufficient for a challenge for cause, his view may constitute a reasonable explanation for the exercise of a peremptory strike.' Johnson v. State, 620 So.2d 679, 696 (Ala.Cr.App. 1992), reversed on other grounds, 620 So.2d 709 (Ala. 1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235
(1993)."
Dallas v. State, 711 So.2d 1101, 1104 (Ala.Crim.App. 1997), aff'd,711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145,142 L.Ed.2d 118 (1998). Also,
 "[t]his court has held that lack of response by or participation of veniremembers is a valid race-neutral reason for striking a prospective juror. Allen v. State, 659 So.2d 135, 146-47 (Ala.Cr.App. 1994)."
Macon v. State, 659 So.2d 221, 223 (Ala.Crim.App. 1994). See also Jacksonv. State, 686 So.2d 429, 431 (Ala.Crim.App. 1996); Johnson v. State,648 So.2d 629, 631 (Ala.Crim.App. 1994). The prosecutor's reasons for striking veniremembers L.B. and M.D. were race-neutral. Therefore, the appellant's argument is without merit.
 III.
The appellant's third argument is that the trial court erroneously admitted into evidence two statements he made to law enforcement officers about his involvement in the offense. Specifically, he contends that he "had been hallucinating as recently as the day before" he made the statements and that he "had also taken about $300 worth of crack within two days of the statement[s] and there was no evidence that he had been drug-tested." (Appellant's brief at p. 19.) Therefore, he concludes that we should hold that he did not voluntarily make the statements "due to [his] condition, including drug ingestion and recent hallucinatory episode." (Appellant's brief at p. 19-20.)
Detective Lark Huber of the Mobile County Sheriff's Department and an Alabama Bureau of Investigation agent interviewed the appellant at the Mobile Metro Jail at approximately 2:45 p.m. on March 23, 1998. During the suppression hearing, Huber testified that she advised the appellant of his rights and that the appellant waived those rights and answered questions about the offense. She also stated that the appellant did not appear to be under the influence of alcohol or drugs when she interviewed him. In particular, she noted that he did not appear to be hallucinating and that he was not hyperactive at that time.
Huber testified that the appellant had stated that he had used crack cocaine after he had killed the victim, but stated that he had not obtained the crack cocaine in Mobile County. She further testified that the appellant had stated that, approximately 24 hours before the interview, he had been hallucinating and running through the woods in Mobile County. On March 23, 1998, Sergeant Donald Valenza of the Houston County Sheriff's Department went to the Mobile Metro Jail to pick up the appellant. During the suppression hearing, Valenza testified that, while he was at the jail in Mobile, he advised the appellant of his rights and that the appellant waived his rights and agreed to talk to him. Valenza and the appellant talked about the case as Valenza drove back to the Dothan area. When he was making his statement to Valenza, the appellant "mentioned [that] he had taken some crack during the time that he had [the victim's] truck." (R. 364.)
Valenza testified that he had previously worked on narcotics cases for seven or eight years and that he was familiar with crack cocaine and its use. Based on that *Page 212 
experience, he stated that the appellant did not appear to be under the influence of crack cocaine at the time he made his statement. Specifically, he noted that the appellant's speech was not slurred, that his motor movement was not impeded, that he was not violent, and that he did not appear to be hallucinating. Rather, the appellant appeared to be aware of his surroundings and who Valenza was, and he spoke coherently and intelligently. Finally, Valenza testified that the appellant did not give any indication that he did not understand his rights or what he was saying.
The defense did not present any evidence during the suppression hearing. Rather, it simply argued that the trial court should suppress the appellant's statements "based on what was apparently a significant amount of drug usage." (R. 394.)
Subsequently, Huber testified that the appellant admitted that he had killed the victim. After he had made that admission, Huber testified that the appellant stated:
 "Then I did about four hundred dollars worth of crack cocaine and drove and drove. . . . I was hallucinating because of all of the crack. I pulled off the Interstate and found a dirt road and left the truck at the end. I then ran through the woods all night. I thought that the police were after me."
(R. 477.) Huber also testified that the appellant stated that he had spent the night at a motel in Mobile. Finally, Valenza testified that the appellant made the following statement:
 "I was hallucinating. I smoked three hundred dollars worth of crack cocaine within five hours. I thought the law was behind me and I freaked out, jumped out of the truck and ran through the briars. That is why I am scratched up."
(R. 406.)
The Legislature has defined "intoxication" to include "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 13A-3-2(e)(1), Ala. Code 1975.
 "In order for intoxication to render a confession inadmissible, it must be shown that the mind of the defendant was substantially impaired when the confession was made. Moore v. State, 488 So.2d 27
(Ala.Cr.App. 1986); Moore v. State, 415 So.2d 1210
(Ala.Cr.App.), cert. denied, 415 So.2d 1210 (Ala.), cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982), and cases cited therein. `Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.' Tice v. State, 386 So.2d 1180, 1185
(Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala. 1980). See also Palmer v. State, 401 So.2d 266, 268
(Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala. 1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982).
 "The voluntariness of an alleged confession is a question of law addressed to the trial court, whose ruling will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Tice v. State, supra; Garrison v. State, 372 So.2d 55 (Ala.Cr.App. 1979). The degree of intoxication which would affect the voluntariness of a statement is a question of fact initially addressed to the trial court and, depending upon its ruling, then to the jury for its consideration. Tice v. State, 386 So.2d at 1185."
Hubbard v. State, 500 So.2d 1204, 1218 (Ala.Crim.App. 1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987).
The testimony of Huber and Valenza indicates that the appellant was not *Page 213 
under the influence of crack cocaine when he made his statements. Although there was some evidence that he had used crack cocaine some time after he killed the victim, the evidence does not indicate that, when he made his statements two days after the murder, his mind and will were substantially impaired and he could not understand the meaning of his words. In fact, the officers testified that he understood what was happening, was coherent, and gave very detailed statements about the murder and his subsequent actions.
 "There is no indication in the record that the appellant was intoxicated to the extent that he could not comprehend the meaning of his words. Therefore, the appellant's drug use was a circumstance to be considered by the jury, rather than a factor which would affect the admissibility of his statement."
Harris v. State, 580 So.2d 33, 36 (Ala.Crim.App. 1990), cert. denied,502 U.S. 840, 112 S.Ct. 127, 116 L.Ed.2d 95 (1991). Accordingly, the trial court properly denied the appellant's motion to suppress his statements.
 IV.
The appellant's fourth argument is that "the trial court improperly admitted into evidence that part of his alleged statement to Detective Huber that referred to his prior theft case." (Appellant's brief at p. 7.) Because he did not object on this ground during Huber's testimony, we review this contention for plain error. See Rule 45A, Ala.R.App.P.
During the State's guilt-phase case-in-chief, Detective Huber testified about a statement the appellant made regarding his involvement in the offense. On direct examination, Huber read the following from notes she had made about the statement:
 "I asked him why did you kill him? He said he was making sexual advances on me and I don't like that kind of stuff. He had been doing it for a long time. On Friday, my no-good attorney told me there was nothing he could do. I am out on bail for Theft of Property and I was mad about that. All of those things added up."
(R. 476-77) (emphasis added).
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."
Rule 404(b), Ala. R. Evid.
 "Evidence of any offense other than that specifically charged is prima facie inadmissible. Nicks v. State, 521 So.2d 1018 (Ala.Cr.App. 1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). However, evidence of collateral crimes or bad acts is admissible as part of the prosecutor's case if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty of the charged offense because of his past misdeeds. Nicks v. State; Brewer v. State, 440 So.2d 1155 (Ala.Cr.App. 1983); C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (4th ed. 1991). Before its probative value will be held to outweigh its potential prejudicial effect, the evidence *Page 214 
of a collateral crime must not only be relevant, it must also be reasonably necessary to the state's case, and it must be plain and conclusive. Averette v. State, 469 So.2d 1371 (Ala.Cr.App. 1985). If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime. Nelson v. State, 511 So.2d 225, 234
(Ala.Cr.App. 1986), aff'd, 511 So.2d 248 (Ala. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Weatherford v. State, 369 So.2d 863
(Ala.Cr.App.), cert. denied, 369 So.2d 863 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979); McElroy's, § 69.02(8). The generally recognized exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted are as follows:
 "`(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'
 "Nelson v. State, 511 So.2d 225, 233 (Ala.Cr.App. 1986); Twilley v. State, 472 So.2d 1130 (Ala.Cr.App. 1985). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Nicks v. State. If the evidence is not so remote as to lose its relevancy, the decision to allow or to not allow evidence of collateral crimes or acts as part of the state's case rests in the sound discretion of the trial court. McGhee v. State, 333 So.2d 865
(Ala.Cr.App. 1976)."
Bush v. State, 695 So.2d 70, 85 (Ala.Crim.App. 1995), aff'd, 695 So.2d 138
(Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320
(1997). "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Ala. R. Evid.
 "Trial courts are vested with considerable discretion in determining whether evidence is relevant, and such a determination will not be reversed absent plain error or an abuse of discretion. Lambert v. Beverly Enterprises, Inc., 695 So.2d 44 (Ala.Civ.App. 1997); see also C. Gamble, Gamble's Alabama Rules of Evidence § 401(b). Alabama recognizes a liberal test of relevancy, which states that evidence is admissible `if it has any tendency to lead in logic to make the existence of the fact for which it is offered more or less probable than it would be without the evidence.' C. Gamble, Gamble's Alabama Evidence, § 401(b) (emphasis original)."
Hayes v. State, 717 So.2d 30, 36 (Ala.Crim.App. 1997).
In this case, evidence about the appellant's collateral bad act was relevant to show his motive for committing the murder because it was one of several factors that he contended led him to commit the murder. Therefore, it was admissible pursuant to Rule 404(b), Ala. R. Evid.
The appellant also appears to argue that the probative value of the evidence about his collateral bad act was substantially outweighed by the danger of unfair prejudice. *Page 215 
 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
Rule 403, Ala. R. Evid.
 "The power to make this determination is vested in the trial court. Zielke v. AmSouth Bank, 703 So.2d 354, 361 (Ala.Civ.App. 1996); see also C. Gamble, Gamble's Alabama Rules of Evidence § 403. We will not disturb such a determination unless it is clearly an abuse of discretion."
Hayes, 717 So.2d at 37. Evidence about the appellant's collateral bad act was very probative because it was one of several factors that the appellant stated caused him to commit the murder. Furthermore, the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. There were very few references to the collateral bad act during the guilt phase of the trial, and there were not any references to the act during the penalty phase of the trial. Also, the collateral bad act in this case apparently involved a pending charge for theft of property rather than a prior conviction for that offense. See Taylor v.State, 808 So.2d 1148 (Ala.Crim.App. 2000), aff'd, 808 So.2d 1215 (Ala. 2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705
(2002). Therefore, we conclude that the probative value of the evidence was not substantially outweighed by its prejudicial effect.
Moreover, there was overwhelming evidence against the appellant, including his confessions of guilt, physical evidence that corroborated his confessions and connected him to the offense, and the fact that he led law enforcement officers to the victim's body. Consequently, error, if any, in the admission of the evidence about the collateral bad act was harmless. See Rule 45, Ala.R.App.P.
Finally, we note that the trial court did not instruct the jury about the proper use of the evidence about the appellant's collateral bad act. However, the appellant did not request such an instruction. Also, the evidence about the prior bad act was not emphasized during either the presentation of evidence or arguments. Further, there was much direct and circumstantial evidence as to the appellant's guilt. In fact, the evidence against the appellant was strong and compelling. Therefore, under the specific facts of this case, we do not find any plain error in this regard. Compare Snyder v. State, [Ms. 1001539, December 14, 2001] ___ So.2d ___ (Ala. 2001).
 V.
The appellant's fifth argument is that the trial court improperly refused to give his requested jury instruction on circumstantial evidence. At trial, he submitted the following proposed jury instruction on circumstantial evidence:
 "The evidence in this case is circumstantial. The law recognizes two kinds of evidence: direct or eyewitness evidence and circumstantial evidence. Just because part of the evidence in this case is circumstantial, it does not mean that it is not as good as direct or eyewitness evidence. Circumstantial evidence that points to the guilt or innocence of the defendant is as good as eyewitness evidence."
(C.R. 148.) The trial court refused to give the requested instruction and instead instructed the jury on circumstantial evidence as follows:
 "The guilt of a Defendant may be proven by circumstantial evidence as *Page 216 
well as by direct evidence or by a combination of both types of evidence. Circumstantial evidence means it is not any direct, positive, eyewitness evidence of any person who saw the commission of a crime. But, it is the events, the happenings, the circumstances surrounding it. Where the State relies on circumstantial evidence either in whole or in part to convict a party charged with the commission of a crime, the degree of proof must be the same. That is beyond a reasonable doubt. That does not mean, however because the testimony is circumstantial that you should disregard it and not consider it because it is circumstantial. But, it does mean that you must be satisfied beyond a reasonable doubt as to the guilt of the party on trial regardless of what kind of evidence is relied upon by the State to establish the guilt of the Defendant."
(R. 547.)
 "`A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App. 1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala. 1986).'
"Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App. 1992)."
Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Crim.App. 1995) (emphasis omitted). The instruction the trial court gave substantially covered the appellant's requested instruction on circumstantial evidence.
 "Under Alabama Code 1975, § 12-16-13, a trial court does not commit error in refusing to give a requested charge where the import and intent of the requested charge are `substantially and fairly' covered in its given charge even though the actual language of the requested charge is not employed in the oral charge. White v. State, 410 So.2d 135, 136
(Ala.Cr.App. 1981)."
Harris v. State, 513 So.2d 79, 82-83 (Ala.Crim.App. 1987). Therefore, the trial court did not abuse its discretion in refusing to give the requested instruction, and the appellant's argument to the contrary is without merit.
 VI.
The appellant's sixth argument is that "[t]he death penalty in Alabama is unconstitutional." (Appellant's brief at p. 7.) Specifically, he contends that "his execution by electrocution would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution as well as Section 15 of the Alabama Constitution of 1901." (Appellant's brief at p. 23-24.) TheEighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Article I, Section 15 of the Alabama Constitution provides: "That excessive fines shall not be imposed, nor cruel or unusual punishment inflicted." Courts have repeatedly held that the death penalty is not per se cruel and unusual punishment and that electrocution is not a cruel and unusual method of capital punishment.See Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235
(1983); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913
(1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346
(1972); Taylor v. State, 808 So.2d 1148 *Page 217 
(Ala.Crim.App. 2000), aff'd, 808 So.2d 1215 (Ala. 2001), cert. denied,534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002); Williams v. State,627 So.2d 985 (Ala.Crim.App. 1991), aff'd, 627 So.2d 999 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Therefore, electrocution does not violate the proscriptions against cruel and/or unusual punishment in the United States Constitution and the Alabama Constitution.
The appellant further argues that
 "the documentation in the record more than substantiates the claim that the equipment used to kill people under State sponsorship is worn out, obsolete and capable of inflicting a torturous death on those forced to submit to it. Numerous design flaws in the system make it unreliable and unnecessarily cruel to individuals condemned to execution here. Training of personnel is inadequate and cursory, and has not been sufficient to prevent negligent actions during past electrocutions that resulted in prolonged torturous electrocutions."
(Appellant's brief at p. 23.) We addressed similar arguments in McNairv. State, 706 So.2d 828 (Ala.Crim.App. 1997), cert. denied, 523 U.S. 1064,118 S.Ct. 1396, 140 L.Ed.2d 654 (1998), and held:
 "`The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there is something inhuman and barbarous, — something more than the mere extinguishment of life." Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned "that this act was passed in the effort to devise a more humane method of reaching the result". Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th Cir. 1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death.'
 "Jackson v. State, 516 So.2d 726, 737 (Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala. 1986).
 "The appellant also contends that trial counsel should have argued that Alabama `utilizes inadequate equipment, unqualified personnel, and inadequate procedures' and that Alabama's electric chair has consistently resulted `in excessive burning and mutilation of condemned prisoners and rendered death by electrocution in Alabama unpredictable and consistently torturous,' as, he asserts, is evidenced by the executions of Horace Dunkins and John Evans (in those executions repeated applications of electrical current were required because of a malfunction in the apparatus) and by the executions of Dunkins, Michael Lindsay, and Wayne Ritter (post-execution examinations revealed burns to portions of the prisoners' bodies).
 "`In Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), the United States Supreme Court, in addressing the issue of whether it was cruel for a state to electrocute a prisoner after the state's first attempted electrocution failed, stated:
 "`"The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method *Page 218 
employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution. . . . We cannot agree that the hardship imposed upon the petitioner rises to that level of hardship denounced as denial of due process because of cruelty."
"`Id. at 464, 67 S.Ct. at 376-77.
 "`The very issues raised by appellant here were addressed in Ritter v. Smith, 568 F. Supp. 1499
(S.D.Ala. 1983), aff'd. in part, rev'd in unrelated part, 726 F.2d 1505 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 218[, 83 L.Ed.2d 148] (1984), wherein the court adopted the opinion and views expressed by Judge Sam C. Pointer after a hearing on the issues, in Raines v. Smith, No. 83-P-1080-S [, 1983 WL 3310] (N.D.Ala.) (unpublished order entered June 3, 1983) (certified copy attached as Appendix, Ritter v. Smith, 568 F. Supp. at 1525-27). The claims presented to Judge Pointer were as follows: (1) given the nature of the equipment and the procedures used, there was unnecessary and wanton infliction of pain and suffering upon persons subject to electrocution in Alabama; (2) the equipment and method involve an unreliable method of execution; and (3) electrocution involves, in its method and equipment, a mutilation of the body which should be viewed as contrary to and violative of the Eighth Amendment. Id. at 1525-26.
 "`After an evidentiary hearing, Judge Pointer held that the claims were due to be dismissed. Id. at 1527. In reaching this decision, Judge Pointer noted that the testimony established that over the past 50 years the chair in question had been used approximately 154 times without any failure; that Evans suffered no pain after the initial shock; and that the possibility that the chair may malfunction at some time in the future does not render its use unconstitutional. Id. at 1526. Judge Pointer relied upon Francis v. Resweber and In re Kemmler[, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890),] in holding that Alabama's method of electrocution is constitutional. Id. at 1526-27. We agree.
 "`There is no evidence before this court that contradicts the findings made by Judge Pointer. There has been absolutely no showing that the State's method of enforcing a death sentence inflicts any more pain than is absolutely necessary. It has not been established that the equipment used in the electrocution of John Lewis Evans malfunctioned or that Evans felt anything after the first split second of the first jolt of electricity administered.'
"Jackson, 516 So.2d at 738."
706 So.2d at 846-47. Thus, the appellant's arguments about Alabama's method of execution are without merit.
Finally, citing Dawson v. Georgia, 274 Ga. 327, 335, 554 S.E.2d 137,144 (Ga. 2001), in which the Georgia Supreme Court held "that the continued use of electrocution for executing death sentences in Georgia violates the Georgia Constitution," the appellant argues that "[t]he fact that our legislature has failed to address this issue should not lead this court to find a different standard for Eighth Amendment issues than that prevailing less than 100 miles away *Page 219 
from Montgomery, Alabama." (Appellant's reply brief at p. 4.) Section12-3-16, Ala. Code 1975, provides:
 "The decisions of the Supreme Court shall govern the holdings and decisions of the courts of appeals, and the decisions and proceedings of such courts of appeals shall be subject to the general superintendence and control of the Supreme Court as provided by Constitutional Amendment No. 328."
Because this court is bound by the decisions of the Alabama Supreme Court, we are not in a position to reverse that court's approval of the current capital punishment system.
 VII.
The appellant's seventh argument is that the trial court improperly allowed the jury to consider whether the murder in this case was especially heinous, atrocious, or cruel when compared to other capital offenses. He also argues that the trial court erroneously found that this offense was especially heinous, atrocious, or cruel when compared to other capital offenses.
 "In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir. 1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court's application of the `especially heinous, atrocious or cruel' aggravating circumstance because this Court's application of it provided a `principled way to distinguish' cases in which the death penalty is appropriately imposed from cases in which it is not. Id. at 1513, 1515 (upholding our application of Ala. Code 1975, § 13A-5-49(8) and quoting Godfrey, 446 U.S. at 431, 100 S.Ct. 1759). The Eleventh Circuit emphasized that the Alabama appellate courts' interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined `especially heinous, atrocious or cruel' to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981)) (emphasis added)."
Ex parte Clark, 728 So.2d 1126, 1138 (Ala. 1998) (footnote omitted). In accordance with these principles, the especially heinous, atrocious, or cruel aggravating circumstance has been narrowly defined.
 "In Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), this Court held that the standard applicable to the `especially heinous, atrocious, or cruel' aggravating circumstance under § 13A-5-49(8) is that for a crime to fit within that section it must be one of `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'"
Ex parte Bankhead, 585 So.2d 112, 124-25 (Ala. 1991), rev'd on other grounds, 625 So.2d 1146 (Ala. 1993).
Dr. Alfredo Parades performed the autopsy on the victim and testified about his observations and conclusions. He stated that the victim had numerous contusions, bruises, and abrasions on his face and head; abrasions on or near his wrists; an abrasion around his collarbone; three abrasions in the center of the upper chest; an abrasion on the back of his right hand; and several abrasions on his back. Parades also observed marks on the right side of the victim's face and noticed that the right side of his face was swollen, which was consistent with him having been alive when the injuries were inflicted. The victim also had multiple contusions on the right side of his neck and fractured or broken thyroid cartilage (or the Adam's apple). Parades stated that that injury would probably have been inflicted with a lot of force.
In addition, the victim had a single stab wound to his chest that penetrated *Page 220 
the chest and one lung, cut a rib, and pierced the coronary arteries of the heart. Upon further examination, Parades discovered a large amount of blood and many blood clots in the chest area, which indicated that the victim was still alive when those injuries occurred.
Parades testified that the cause of death was the single stab wound to the chest and multiple blunt force trauma to the face, neck, and lower back. Although he stated that the victim's sensitivity to pain may have decreased rather quickly after he was stabbed, Parades also concluded that the stab wound would not have been immediately fatal and that the victim could have lived for several minutes after that initial wound was inflicted. In fact, he testified that, in his opinion, based on the internal bleeding he observed, the victim was alive when all of the injuries were inflicted.
During its penalty-phase jury instructions, the trial court explained:
 "For a Capital Offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in any Capital Offense. For a Capital Offense to be especially cruel, it must be a [conscienceless] or pitiless crime which is unnecessarily [torturous] to the victim. All Capital Offenses are heinous, atrocious or cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness or cruelty exceeds that which will always exist when a Capital Offense is committed."
(R. 661.) Subsequently, in its sentencing order, the trial court found:
 "The Court determines the existence of the second aggravating circumstance for the following reasons. After the Defendant Hocker stabbed the victim Robinson in the chest he took the victim to a remote area of Henry County, Alabama, and viciously beat him causing multiple injuries including a broken Adam's apple. According to the pathologist the victim remained alive throughout this beating and could experience pain. This beating took place after the victim was incapacitated and no longer a threat to the Defendant. If the Defendant had stabbed the victim once and left him to die, the Court would not have allowed the second aggravating circumstance. However, in light of the above, the Court finds beyond a reasonable doubt the existence of the second aggravator."
(C.R. 193-94.)
The above-referenced testimony was sufficient to support a jury instruction on the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses. It was also sufficient to support the trial court's conclusion that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Therefore, the appellant's arguments are without merit.
 VIII.
The appellant's eighth argument is that the trial court improperly deleted the following language from one of his requested penalty-phase jury instructions: "I charge you, members of the jury that the fact that you have found [the appellant] guilty beyond a reasonable doubt of the crime is not an aggravating circumstance." (C.R. 155.) Specifically, he contends that "[t]he proffered charge was a correct statement of the law, since conviction of capital murder is not an enumerated aggravator under Section 13A-5-49, Code of Alabama 1975." (Appellant's brief at p. 26.)
We addressed and rejected a similar argument in Haney v. State,603 So.2d 368 *Page 221 
(Ala.Crim.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied,507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993), holding:
 "Appellant contends that the trial court incorrectly instructed the jury, in the sentencing phase of the trial, that it was to consider, as proven beyond a reasonable doubt by virtue of its guilty verdict, the aggravating circumstance under § 13A-5-49(6): that the capital offense of murder for hire, for which she had been found guilty, was committed for pecuniary gain. . . .
". . . .
 "Appellant's argument completely ignores that our capital murder statute contemplates that certain aggravating circumstances will be established by certain capital verdicts. This practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as `double-counting' or `overlap.' This practice has been upheld. See Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (upholding Louisiana's capital offense statute in which the intent to kill more than one person is both an element of the capital offense and an aggravating circumstance); Ritter v. Thigpen, 828 F.2d 662 (11th Cir. 1987) (double-counting or overlap does not rise to a constitutional level); Ex parte Ford, 515 So.2d 48
(Ala. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988) (allowing the jury and trial court, in capital case, to find, as an aggravating circumstance for sentencing purposes, the same aggravation alleged in the indictment is not unconstitutional); Lawhorn v. State, 581 So.2d 1159
(Ala.Cr.App. 1990) (the finding and consideration of a relevant aggravating circumstance is not precluded by its inclusion in the definition of the capital offense charged); Kuenzel v. State, 577 So.2d 474
(Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991) (overlap is constitutionally permissible).
 "`The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.'
 "Lowenfield v. Phelps, 484 U.S. at 244-45, 108 S.Ct. at 554.
 "Our statutes that allow double-counting recognize that the jury, by its guilty verdict, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt.
"Section 13A-5-45(e) provides, as follows:
 "`At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstances which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.'
"Section 13A-5-50 provides, as follows:
 "`The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.
 "`By way of illustration and not limitation, the aggravating circumstance specified in section 13A-5-49(4) shall *Page 222 
be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of section 13A-5-40.'
 "Accordingly, we conclude that the aggravating circumstance that `[t]he capital offense was committed for pecuniary gain' was established, as a matter of law, by appellant's conviction of the capital crime of murder for hire, and the trial court correctly so charged the jury."
603 So.2d at 378-80.
Similarly, in this case, the aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged . . . in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, . . . robbery" was established, as a matter of law, by the appellant's conviction for the capital offense of robbery-murder. The above-referenced portion of the requested instruction did not accurately state the law with respect to the facts of this case. For these reasons, the trial court properly refused to give the above-referenced portion of the requested instruction, and the appellant's argument is without merit.
 IX.
The appellant's ninth argument is that "[t]he trial court improperly sentenced [him] to death based on all the matters . . . considered in the sentencing order." (Appellant's brief at p. 7.) Specifically, he contends that the trial court "specifically acknowledged that [he] had experienced `an atrocious, horrendous family life, being physically, verbally and sexually abused'"; that there was not a basis for finding that the killing was especially heinous, atrocious, or cruel when compared to other capital offenses; and that the trial court "erred in its specific finding that [he] stabbed [the victim] first and then drove him to the remote area of the county." (Appellant's brief at pp. 26-27.) Therefore, he concludes that the trial court improperly determined that the aggravating circumstances outweighed the mitigating circumstances. Because he did not first present this specific argument to the trial court, we review it for plain error. See Rule 45A, Ala.R.App.P.
For the reasons set forth in Part VII of this opinion, the appellant's argument that there was not a basis for finding that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses is without merit. Therefore, the trial court properly found that that aggravating circumstance existed in this case.
Also, although the appellant argues that the trial court improperly found that he stabbed the victim and then drove him to the remote area where he left the body, it is not entirely clear that that finding is erroneous. The appellant admitted that he stabbed the victim while the victim was in the driver's seat of the vehicle. He also admitted that he took the victim out of the vehicle, further assaulted him, and left him in the remote area. However, he did not state precisely when he stabbed the victim and when the two arrived at the remote area. Therefore, error, if any, in the trial court's finding is harmless. See Rule 45, Ala.R.App.P.
Further, the trial court's findings about the appellant's background did not necessarily warrant a sentence of imprisonment for life without the possibility of parole.
 "[T]he decision as to whether a particular mitigating circumstance is sufficiently proven by the evidence and the weight to be accorded to it rests with the trial court. See Haney v. State, *Page 223 603 So.2d 368 (Ala.Cr.App. 1991), affirmed, 603 So.2d 412
(Ala. 1992).
 "`"`Although consideration of all mitigating circumstances is required by the United States Constitution, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the decision of whether a particular mitigating circumstance in sentencing is proven and the weight to be given it rests with the judge and jury. Lucas v. State, 376 So.2d 1149 (Fla. 1979).' Smith v. State, 407 So.2d 894, 901 (Fla. 1981)."'
 "Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App. 1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985)."
Giles v. State, 632 So.2d 568, 572 (Ala.Crim.App. 1992), aff'd,632 So.2d 577 (Ala. 1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694,129 L.Ed.2d 825 (1994).
Finally, for the reasons set forth in Part XI of this opinion, we conclude that the trial court properly weighed the aggravating and mitigating circumstances in this case and sentenced the appellant to death. Therefore, the appellant's argument to the contrary is without merit.
For these reasons, we do not find that there was any plain error with regard to the trial court's sentencing order.
 X.
The appellant's tenth argument is that the cumulative effect of all of the above-referenced allegations of error deprived him of due process and a fair trial. We have considered each of the allegations of error individually, and we have not found that any of those allegations of error require reversal. We have also considered the allegations of error cumulatively, and we do not find that "the accumulated errors have `probably injuriously affected [the appellant's] substantial rights.'" Exparte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.), cert. denied,534 U.S. 831, 122 S.Ct. 77, 151 L.Ed.2d 41 (2001) (quoting Rule 45, Ala.R.App.P.). Therefore, the appellant's argument is without merit.
 XI.
Pursuant to § 13A-5-53, Ala. Code 1975, we are required to address the propriety of the appellant's conviction and sentence of death. The appellant was indicted for and convicted of capital murder because he committed a murder during the course of a robbery. See §13A-5-40(a)(2), Ala. Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. Specifically, it found that the State had proved two aggravating circumstances — 1) the appellant committed the capital offense while he was engaged in the commission of a robbery,see § 13A-5-49(4), Ala. Code 1975, and 2) the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. The trial court considered each of the statutory mitigating circumstances set forth in § 13A-5-51, Ala. Code 1975, but it did not find that there were any statutory mitigating circumstances in this case. The trial court also made the following findings as to nonstatutory mitigating circumstances:
 "The Defendant called the Mobile authorities and turned himself in to the Mobile County Sheriff's Department. The Defendant did not resist arrest. The Defendant gave a complete confession and showed law enforcement *Page 224 
officers the crime scene and the body of the victim. The Defendant experienced an atrocious, horrendous family life, being physically, verbally and sexually abused. His father committed suicide. Much of this information was not presented during the penalty phase for reasons known only to Defendant Hocker."
(C.R. 195-96.) The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala. Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. The appellant committed a murder during the course of a robbery. Similar crimes are being punished by death throughout this state. See Gaddy v. State, 698 So.2d 1100
(Ala.Crim.App. 1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied,522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997); Bush v. State,695 So.2d 70 (Ala.Crim.App. 1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); Payne v.State, 683 So.2d 440 (Ala.Crim.App. 1995), aff'd, 683 So.2d 458 (Ala. 1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481
(1997); Windsor v. State, 683 So.2d 1027 (Ala.Crim.App. 1994), aff'd,683 So.2d 1042 (Ala. 1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438,137 L.Ed.2d 545 (1997); Taylor v. State, 666 So.2d 36 (Ala.Crim.App.), opinion extended after remand, 666 So.2d 71 (Ala.Crim.App. 1994), aff'd,666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928,133 L.Ed.2d 856 (1996); Peoples v. State, 510 So.2d 554 (Ala.Crim.App. 1986), aff'd, 510 So.2d 574 (Ala.), cert. denied, 484 U.S. 933,108 S.Ct. 307, 98 L.Ed.2d 266 (1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. See Rule 45A, Ala.R.App.P.
For the above-stated reasons, we affirm the appellant's conviction and sentence of death.
AFFIRMED.
McMILLAN, P.J., and COBB, SHAW, and WISE, JJ., concur. *Page 839