Anthony Tyson was convicted of capital murder for the deaths of Derek Cowan and Damien Thompson. Tyson was convicted of two counts under §13A-5-40(a)(2), Ala. Code 1975 — murder committed during the course of a robbery in the first degree — and of one count under §13A-5-40(a)(10) — the murder of two or more people during one act or pursuant to one scheme or course of conduct. By a vote of 10-2, the jury recommended that Tyson be sentenced to death. The trial court followed the jury's recommendation and sentenced Tyson to death by electrocution. In a unanimous decision, the Court of Criminal Appeals affirmed Tyson's conviction and sentence. Tyson v. State, 784 So.2d 328
(Ala.Crim.App. 2000). We granted certiorari review, pursuant to Rule 39(c), Ala.R.App.P.[1] We affirm the judgment of the Court of Criminal Appeals.
Tyson has raised 13 issues for our review. The Court of Criminal Appeals fully addressed and correctly resolved each of these issues in its thorough and well-researched opinion. Only four of those issues warrant further discussion. Three of them question the validity of the search warrant; the final issue challenges limitations the trial court placed on Tyson's cross-examination of the prosecution's expert witness on DNA evidence.
 I. Facts
On January 4, 1997, Porter Key was driving on Franklin Road in Macon County when he discovered Cowan's body in the middle of the road. Key said he had to drive off the road to avoid the body. He *Page 359 
said that he saw a green Acura automobile roll off the road and strike a fence, and that the car then backed up onto the road and sped off in the direction of Tuskegee. Key said he thought the driver of this car had been involved in a hit-and-run accident, so, he said, he chased the car in an attempt to get the license-plate number. He was unable to keep up and lost the car somewhere in Tuskegee. Later, law-enforcement personnel discovered that Cowan had not been the victim of a hit-and-run accident, but had been shot twice in the back of the head.
Within minutes after Key discovered Cowan's body, Thompson's body was discovered slumped forward on the passenger side of an Acura automobile that was in the bushes at an intersection in Tuskegee. The keys were in the car and it was still running. Thompson had also been shot twice in the head.
Alphonso Cardwell testified that he and Cowan had been scheduled to meet for a drug exchange on a dirt road off County Road 36 on January 4, 1997. He testified that as he was driving to the designated location he saw Cowan, Thompson, and a third male, whom he identified at trial as Anthony Tyson, drive by in a green Acura. The Acura was being followed, he said, by another vehicle, driven by Cornelius "D'Rock" Drisker. Cardwell testified that when he arrived at the location of the planned exchange, he gave Cowan $300 in exchange for cocaine. Minutes later, Cowan's body was discovered. Witnesses testified that one of his pockets was turned inside out. The $300 was missing.
Police connected Tyson to the murders while investigating a shooting in Union Springs that occurred 10 days after the double murder in Macon County. Nicholas Martin testified that Tyson and three other people shot at him from a car as he was walking his dog. He testified that he recognized Tyson and that he went to the police station and signed a warrant for Tyson's arrest.[2] Law-enforcement authorities later determined that the gun identified as the weapon used in the Union Springs shooting was the same weapon used in the murder of Cowan and Thompson.
Substantial forensic evidence connected Tyson to the double murder. After executing a search warrant, based on evidence obtained in the investigation of the Union Springs shooting, the police recovered from Tyson's apartment a Lorcin chrome .380 pistol and bloodstained sneakers. A DNA analysis of the blood on the sneakers showed that the blood matched Thompson's blood. Police recovered Tyson's fingerprints from the green Acura. Spent shell casings recovered from the Acura, from near Cowan's body, and from the Union Springs shooting were identified as having been fired by the same gun, a Lorcin .380, which was identified as belonging to Tyson.
Tyson's defense at trial was that he did not kill Cowan and Thompson. He attempted to show that another person could have committed the murders, specifically, the man who had been seen in a car with the victims earlier on the day of the murders.
 II. The Search Warrant
Tyson argues that evidence seized from his apartment should have been suppressed because, he says, the search warrant was not based on sufficient probable cause, listed the wrong address, and did not authorize a nighttime search. The affidavit *Page 360 
in support of the search warrant reads:
 "I am Raymon Dawson Smith. I work as an Agent in the Alabama Bureau of Investigations, a division of the Alabama Department of Public Safety. I have worked for the Department of Public Safety for over 21 years, as an officer. I have worked in `ABI,' Alabama Bureau of Investigations for about a year.
 "On the evening of January 14, 1997, a shooting occurred in Union Springs, Alabama, that involved the firing of multiple shots from a vehicle occupied by several black males at one Nicholas Martin (hereinafter Martin). Martin is a 26 year old black male from Union Springs. Martin identified the vehicle as a blue Pontiac displaying a `55' tag occupied by four black males. Words were apparently exchanged and then shots were fired from the vehicle at Martin, who then ran. Martin identified one of the occupants of the vehicle as a person known to him as Anthony Tyson (hereinafter Tyson). Martin stated that he has seen Tyson on several occasions prior to this incident and can identify Tyson. Martin also identified Tyson as one of the person[s] shooting from the vehicle.
 "The police were notified by phone and a description of the vehicle, which left the area, was provided and dispatched. Union Springs officers tried to stop a vehicle fitting the description given. The said vehicle fled the stop attempt; and chase commenced. State Troopers became involved in the chase. The vehicle fled Bullock County into Macon County where Tuskegee Police officers and Macon County sheriff's deputies joined the pursuit.
 "The vehicle was pursued onto Macon County Road 3, or Howard Road, and entered the area of the project apartments. The vehicle finally stopped on Foster Street in Tuskegee, where several subjects fled the car and escaped. One subject, Willie Jernel Stinson, an 18 year old black male, was captured before he could flee the vehicle.
 "After having his Miranda rights read to him, Stinson identified the other three occupants of the vehicle, including Tyson. Stinson stated that he was in the car with the other three subjects in Union Springs. Stinson stated that Tyson shot several times at an individual in Union Springs. Stinson stated that Tyson use[d] a .380 semi-automatic pistol during the altercation. Stinson further stated that he has seen Tyson with this .380 semi-automatic pistol on several occasions.
 "The Tuskegee Police Department impounded the vehicle that was apprehended during the high speed chase. Consent to search the vehicle was obtained from the owner. A search of the vehicle revealed one .380 caliber shell casing.
 "Investigators returned to the shooting scene on Ellis Street in Union Springs. Several empty cartridge casings were found on the ground in the area, all .380 caliber. One spent bullet was also found.
 "The vehicle that the subjects fled in stopped approximately 2.5 miles from Tyson's residence before subjects jumped out and ran. Tyson was seen at his residence less than 36 hours after the shooting incident in Union Springs.
 "On January 17, 1997, officers attempted to serve arrest warrants from Bullock County on Tyson at his residence at 401-A North Church Street, Tuskegee, Alabama. While attempting to serve the arrest warrants on Tyson, officers encountered three subjects inside the residence. The subjects *Page 361 
informed officers that they had just missed Tyson by approximately five minutes. One of the subjects in the residence, Maurice Gay, was also identified by Stinson as being involved in the shooting in Union Springs. Maurice Gay came out of the rear bedroom pointing a shotgun at officers.
 "For the foregoing reasons, the undersigned officer has probable cause to believe that the weapon(s) used during the shooting in Union Springs and other related evidence may be contained in Tyson's residence."
A. Whether the search-warrant affidavit was based on sufficientprobable cause.
When reviewing the question whether officers had probable cause, this Court has stated:
 "`Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued.'"
Crittenden v. State, 476 So.2d 632, 633-34 (Ala. 1985) (quoting Illinoisv. Gates, 462 U.S. 213, 239 (1983) (emphasis omitted)). The affidavit supporting the warrant in this case presents significant information, not merely conclusory statements "that [give] the magistrate virtually no basis at all for making a judgment regarding probable cause." Id. at 633. Agent Smith's affidavit provides a detailed description of the investigation leading to his belief that the weapon used in the Union Springs shooting would be found at Tyson's apartment. The affidavit provides sufficient information to allow the magistrate to make an independent determination as to the existence of probable cause. Therefore, we conclude that the warrant was based on probable cause.
B. Whether an erroneous address listed on the search warrant rendersit invalid.
Tyson contends that his address was 401-C North Church Street. Therefore, he argues, because the warrant was issued for the search of 401-A North Church Street, it failed to designate with particularity the location actually searched and is therefore invalid. Tyson's argument is without merit. An error in the address does not necessarily invalidate a warrant.
In United States v. Burke, 784 F.2d 1090, 1092 (11th Cir.), cert.denied, 476 U.S. 1174 (1986), the United States Court of Appeals for the Eleventh Circuit noted:
 "A warrant's description of the place to be searched is not required to meet technical requirements or have the specificity sought by conveyancers. The warrant need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority. An erroneous description of premises to be searched does not necessarily render a warrant invalid."
In this case, law-enforcement officers, while attempting to execute an arrest warrant issued against Tyson, located his residence. The officers did not find Tyson; instead, they found several armed persons in his residence. In their opinion, that circumstance indicated a high degree of probability that the weapon used in the Union Springs shooting would be found on the premises. At that time, Agent Smith *Page 362 
left officers securing the premises while he sought the search warrant.
In his effort to secure the search warrant, Agent Smith spoke with Tyson's landlord and obtained a copy of Tyson's lease agreement, which lists Tyson's apartment number as 401-A rather than 401-C. Considering that Agent Smith, the executing officer, had been to Tyson's residence and had left officers securing that residence, there can be little doubt that he planned to return to the correct residence to conduct the search. The actions of Agent Smith and the officers who stayed behind to secure the premises ensured that there would be no mistake as to which apartment the police intended to search. Under these circumstances, we decline to say that, because the wrong apartment number appeared on the face of the warrant, the warrant was invalid.
C. Whether the failure of the warrant to designate a nighttimesearch invalidates the search.
Tyson argues that the warrant to search his apartment contained a box that the judge should have checked in order to authorize a nighttime search. That box was not checked, yet the search was made at night.
Rule 3.10, Ala.R.Crim.P., provides, in pertinent part:
 "In cases in which the property to be seized does not include a controlled substance, a search warrant must be executed in the daytime unless the affidavits state positively that the property is on the person or in the place to be searched, in which case the search warrant may be executed at any time of the day or night. Except in cases in which the property to be seized includes a controlled substance, the issuing judge or magistrate must state in the warrant, according to the character of the affidavits, whether it is to be executed by day or at any time of the day or night. In cases in which the property to be seized includes a controlled substance, a warrant may be executed at any time of the day or night and the warrant need not state whether it is to be executed by day or at any time of the day or night."
Similarly, § 15-5-8, Ala. Code 1975, provides:
 "In cases in which the property to be seized does not include a controlled substance, a search warrant must be executed in the daytime unless the affidavits state positively that the property is on the person or in the place to be searched, in which case it may be executed at any time of the day or night. Except in cases in which the property to be seized includes a controlled substance, the issuing judge or magistrate must state in the warrant, according to the character of the affidavits, whether it is to be executed by day or at any time of the day or night. In cases in which the property to be seized includes a controlled substance, a warrant may be executed at any time of the day or night."
Tyson argues that because the warrant did not authorize a nighttime search, any evidence found at his residence is the fruit of an illegal search. Quoting Ex parte Turner, [Ms. 1971735, April 7, 2000] ___ So.2d ___ (Ala. 2000), Tyson argues: "`There is no common law authorizing search warrants. Statutes authorizing searches are strictly construed against the prosecution [and] in favor of the liberty of the citizen.'" ___ So.2d at ___ (quoting Kelley v. State, 55 Ala. App. 402, 403,316 So.2d 233, 234 (Ala.Crim.App. 1975)). Turner dealt with a search predicated on an anticipatory search warrant issued in September 1995. This Court held that the search was unconstitutional because at that time there was no Alabama statute *Page 363 
authorizing anticipatory search warrants.[3] Turner, ___ So.2d at ___. This case is distinguishable from Turner because § 15-5-8
specifically authorizes the execution of nighttime warrants.
In rejecting Tyson's argument as to this issue, the Court of Criminal Appeals relied on Gamble v. State, 473 So.2d 1188 (Ala.Crim.App. 1985). In Gamble, the court stated:
 "The question, as the trial court framed it in its order denying the motion to suppress, is `whether or not, under the circumstances of this case, the failure of the issuing judge to use the words "at anytime of day or night" or words of similar import in the warrant invalidates the warrant and renders inadmissible the evidence discovered during the search.' We answer that question in the negative.
 "In Dean v. State, 54 Ala. App. 270, 307 So.2d 77
(Ala.Cr.App. 1975), this court upheld a nighttime search for which the warrant lacked a directive that it be served `at any time of the day or night.' We found that because the warrant was in fact issued at night under authorization for an `immediate' search, the statutory requirement of § 15-5-8 was satisfied. See also United States v. Sturgeon, 501 F.2d 1270 (8th Cir.), cert. denied, 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974). The same situation is present here. As the trial judge found, `The issuing judge was requested and did issue the warrant in the middle of the night knowing that it would be immediately executed.'
". . . .
 "Although there is a split of authority on the admissibility of evidence obtained in a nighttime search when the warrant does not contain language authorizing nighttime execution, see generally Annot. 58 A.L.R. Fed. 757 (1982); compare State v. Dudgeon, [13 Ariz. App. 464, 477 P.2d 750 (1970)] (allowing evidence), with State v. Dalrymple, 80 N.M. 492, 458 P.2d 96 (1969) (disallowing evidence on the ground that a warrant must conform to statutory requirements in every material detail), of those courts finding the warrant technically invalid many have, nevertheless, refused to order suppression of the evidence on one or more of the following grounds, namely: (1) a statutory — as opposed to a constitutional — violation does not automatically warrant exclusion, see, e.g., United States v. Searp, [586 F.2d 1117 (6th Cir. 1978), cert. denied, 440 U.S. 921 (1979)]; State v. Lien, 265 N.W.2d 833 (Minn. 1978); (2) the statutory violation was not a result of bad faith conduct on the part of law enforcement authorities, see e.g., United States v. Searp, supra; and (3) the violation did not affect the defendant's substantial rights, see e.g., United States v. Ravich, 421 F.2d 1196
(2d Cir.), cert. denied, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970)."
473 So.2d at 1194-95. It is clear in this case, as it was in Gamble, that the police officers were acting in good faith. Agent Smith had every intention of obtaining a search warrant authorizing a nighttime search and submitted an affidavit clearly establishing grounds for a nighttime search. Furthermore, he requested the warrant at 7:45 p.m., after dark, and executed the warrant at 8:00 p.m. Agent Smith also informed the magistrate issuing the warrant that other officers at Tyson's residence were waiting for the warrant. *Page 364 
Had the warrant been issued in the daytime, the necessity for checking the box authorizing a nighttime search would be readily understandable. However, where, as here, the warrant was issued after dark and the magistrate knew of its imminent execution, for us to require that the box be checked would be to exalt form over substance. The magistrate issued the warrant knowing that Agent Smith planned to execute it immediately.[4] Therefore, applying the exclusionary rule in this case would serve no purpose.
Discussing the exclusionary rule, the United States Supreme Court has stated:
 "The [exclusionary rule] operates as `a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.' United States v. Calandra, [414 U.S. 338, 348 (1974)].
". . . .
 ". . . `Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury.' United States v. Payner, 447 U.S. 727, 734
(1980). . . . Indiscriminate application of the exclusionary rule, therefore, may well `generat[e] disrespect for the law and administration of justice.' [Stone v. Powell, 428 U.S. 465, 491 (1976)]."
United States v. Leon, 468 U.S. 897, 906-08 (1984). In Massachusetts v.Sheppard, 468 U.S. 981 (1984), a case in which police officers, acting in good faith, secured a search warrant that later was held invalid because of a clerical error committed by the magistrate who issued the warrant, the United States Supreme Court held:
 "In sum, the police conduct in this case clearly was objectively reasonable and largely error-free. An error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers, who made the critical mistake. `[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges.' Illinois v. Gates, 462 U.S. 213, 263 (1983) (White, J., concurring in judgment). Suppressing evidence because the judge failed to make all the necessary clerical corrections despite his assurances that such changes would be made will not serve the deterrent function that the exclusionary rule was designed to achieve. Accordingly, federal law does not require the exclusion of the disputed evidence in this case."
468 U.S. at 990-91 (footnote omitted). The same rationale applies in the case before us. As noted previously, when the warrant was issued, the issuing judge was fully aware that Agent Smith intended to conduct a nighttime *Page 365 
search. The officers were acting in good faith and with reasonable reliance on a belief that the search warrant was valid. Therefore, suppressing the evidence gained from the search would not serve as a deterrent. We decline to exclude the evidence recovered from Tyson's apartment because of a clerical error made by the issuing judge — failing to check the box authorizing a nighttime search. See Massachusetts v. Sheppard.
 III. Cross-Examination of the DNA Expert
Tyson argues that the trial court committed reversible error when it denied him what he characterizes as the right to fully cross-examine the prosecution's expert witness on DNA evidence. Tyson contends he should have been able to cross-examine the DNA expert regarding the possible effects of genetic subgroups in Alabama on the reliability of DNA statistics. In regard to a defendant's claim that he was denied his right of cross-examination, this Court has stated:
 "[W]e note that a criminal defendant has the right to a thorough and sifting cross-examination, but that right is not absolute. The latitude and extent of cross-examination are matters within the sound discretion of the trial court, and in the absence of abuse, that discretion is not reversible on appeal."
Ex parte Pope, 562 So.2d 131, 134 (Ala. 1989), cert. denied, 498 U.S. 841
(1990). We conclude, however, that Tyson has not shown that the trial court abused its discretion by refusing to allow him to cross-examine the DNA expert as he wanted to do.
Tyson argues that the trial court erred in refusing to allow the following line of questioning to continue:
 "Q. [By Tyson's counsel] Now, you mentioned 10 percent. If we could just take this example. Let's say that y'all were doing a survey in Europe, and let's say that you found that in doing your survey in Europe, you found — I've got blond written up here. Let's say one in ten people in Europe had blond hair, and let's say that in the survey of all of Europe you found that one in ten people had blue eyes. And in continuing on in your survey, you found that one in ten people in your survey of all of Europe had fair skin, okay? Now, in the multiplication rule, correct me if I'm wrong, would you not be multiplying these 10's on the bottom so that it would be 10 times 10 times 10 to get one in a thousand people in Europe would have blond hair, blue eyes and fair skin?
"A. That's true. That's the way it's done.
"Q. That would apply over all of Europe, correct?
". . . .
"A. Whatever your number of ten came from, yes.
 "Q. Now, if you were to take this multiplication of the product rule that you have come up with, this one in a thousand and you were to apply it and say in the Nordic region of Norway or Sweden, you would still be saying to expect to find one out of a thousand people in that area of Europe would have blond hair, blue eyes and fair skin, correct?
"[The prosecutor]: I object to that, that being —
"THE COURT: Sustained. . . ."
In sustaining the objection, the trial court stated:
 "The witness was asked to assume three different traits that are quite typical of Nordic populations. The witness was then asked, in my judgment deliberately, the extremely misleading question that that would lead to the conclusion *Page 366 
that one out of a thousand persons in that population would have that characteristic. Now, that leads us into a realm of theoretical argument that is inappropriate to the trial of the case. That would make the cross-examination irrelevant and not to mention improper because it asks an expert witness to make assumptions that are not based on facts that are available in this case, and it would have presented to the jury the appearance that the witness who was asking — answering the question correctly based on a statistical analysis but had been led into that by asking — by being asked false assumptions. . . .
". . . .
 "The problem is that this is not an academic environment, and what you did was not merely leading nor was it testing his knowledge. It would — whether you intended it or not, it had a strong tendency to create a misimpression in the eyes of the jury, and you almost had him expressing — appearing to express the opinion that one in a thousand persons in a Nordic country had blond hair, blue eyes, and a fair complexion. And that was misleading because it was based on the assumption that you injected to start with."
We agree with the trial court that the line of questioning and the tactics employed by Tyson's counsel were irrelevant and could have misled the jury.
Furthermore, the DNA expert had previously testified during cross-examination as follows:
 "That has been statistically proven that there is no subgrouping within the State of Alabama. What that means is — a way to describe that would be a lot of American Indians, for example, let's say up in Alaska, very small community, a lot of them mate and marry one another. So, a lot of the same traits that they have stay within that very small pool because those people never go to Tuskegee, Alabama and mate, for example. So, that's what's called a very small subgroup. However, in Alabama the traits that we see within the black and the white population exhibit no subgrouping. And that's been shown statistically, as well as the fact that even to account for the possibility of subgrouping, we impose minimum numbers or frequencies to be even more conservative and account for that room [sic] of possibility."
Tyson's counsel had already questioned the DNA expert regarding genetic subgroups and the possible effect such subgroups would have on statistical analyses of the population of Alabama. The witness gave a very thorough explanation regarding the effect of genetic subgroups in Alabama. Therefore, the trial court did not abuse its discretion when it denied Tyson the privilege of repeating such questioning in a manner likely to mislead the jury.
 IV. Conclusion
We have carefully reviewed all the issues presented in Tyson's petition, in the parties' briefs, and at oral argument. We find no error, in either the guilt phase or the penalty phase of Tyson's trial, that would warrant a reversal of his convictions or his sentence. We therefore affirm the judgment of the Court of Criminal Appeals.
AFFIRMED. *Page 367 
HOOPER, C.J., and MADDOX, HOUSTON, COOK*, SEE, LYONS, BROWN, and ENGLAND, JJ., concur.
* Although Justice Cook did not sit at oral argument of this case, he has listened to the tape of oral argument.
[1] Because this case was under review before May 19, 2000, the effective date of the recently revised version of Rule 39, Ala.R.App.P., we have searched the record in this case for plain error.
[2] Tyson later pleaded guilty to attempted murder as a result of the events that occurred in Union Springs.
[3] Anticipatory search warrants are now permitted in Alabama. See Rules 3.7 and 3.8, Ala.R.Crim.P., effective December 1, 1997.
[4] The warrant contains the following language:
 "Affidavit in support of application for a search warrant having been made before me, and the Court's finding that grounds for the issuance exist or that there is probable cause to believe that they exist, pursuant to Rule 3.8, Alabama Rules of Criminal Procedure, you are hereby ordered and authorized to forthwith search:"
(Emphasis added.) "Forthwith" means "immediately." Merriam-Webster'sCollegiate Dictionary 459 (10th ed. 1997). The warrant, issued at 7:45 P.M., thus authorized an immediate search, a search that clearly would be a nighttime search.