KELLUM, Judge.
The appellant, Montana Jordan Windsor, was convicted of robbery in the first degree, a violation of § 13A-8-41, Ala. Code 1975. The circuit court sentenced Windsor as a habitual felony offender with two prior felony convictions to 120 years’ imprisonment. The circuit court ordered Windsor to pay a fine of $18,000, restitution in the amount of $32,000, and court costs.
The record indicates the following pertinent facts. On April 3, 2010, Windsor entered a CVS Pharmacy retail store in Dothan wearing a beanie and gloves, which CVS staff found suspicious because “nobody dresses that warm in the middle of Spring.” (R. 30.) Windsor walked quickly down an aisle of the store toward the pharmacy department. As he approached the pharmacy, the pharmacy technician on duty at that time saw that Windsor was carrying a handgun. Windsor jumped over the front counter of the pharmacy and demanded OxyContin. Windsor was in the store for approximately two minutes, during which time numerous employees of the pharmacy were able to see and identify Windsor. After Windsor secured *878 the OxyContin he fled the store. The police estimated the value of the OxyCon-tin in his possession to be between $35,000 and $40,000, with a street value of over $100,000.
At the request of the Dothan Police Department, a local television station aired a videotape of the robbery recorded by the CVS Pharmacy store’s security cameras during the evening news as a “Crime Stoppers” segment. Dewey Emflnger saw that video of the robbery on the news and recognized that the robber had a similar physical appearance to Windsor, who had worked as an employee at Emfinger’s business for three months. Emflnger testified that he thought Windsor was the person in the video from “the way [Windsor] moved, the outline of his face, you know, and his build, size.” (R. 78.) Emflnger telephoned the Crimestoppers tip line and reported this information to authorities.
Shortly after Emfinger’s telephone call, Cp. Chris Barbaree of the Dothan Police Department brought a photographic lineup card that contained a picture of Windsor to the CVS store. One of the pharmacy technicians, Megan Ferry, identified Windsor as the person who had robbed the store. Ferry was able to pick Windsor out “immediately.” This led to Windsor’s arrest.
During the trial, several CVS employees who were present at the time of the robbery identified Windsor as the person who had robbed the store. The first CVS employee to testify was Megan Ferry, who testified that once she saw Windsor enter the store with a gun she “was trying to get a description of [Windsor]... and trying to pay attention to any details I could relay to the officers once they got on the scene.” (R. 33.) Ferry further testified that she picked Windsor out of a photographic lineup as the person that robbed the store, and she also identified Windsor in court as the perpetrator of the robbery.
Brittany Hutt, another pharmacy technician on duty at the time of the robbery, testified that at approximately 4:30 p.m. Windsor jumped over the counter of the pharmacy and that she was “face-to-face” with Windsor. Hutt stated that Windsor’s physical appearance was “clear as day, no mask or anything.” (R. 58.) She then pointed to Windsor in the courtroom and identified him as the “person that jumped the counter.” (R. 59.) Hutt testified that Windsor demanded OxyContin and was behind the pharmacy counter for two or three minutes. Hutt further testified that when shown a photographic lineup, she told Cpl. Barbaree that she was “a hundred percent” sure that Windsor was the person who had robbed the CVS store.
Jarrod Tidwell was a pharmacist at CVS and was working at the time Windsor robbed the pharmacy. Tidwell testified that he had an unobstructed view when Windsor climbed over the counter of the pharmacy department with a gun in his hand. Tidwell was asked how sure he was that Windsor was the person who had robbed the CVS store, leading to the following response:
“I got a great look at him. I mean, it was well lit. I had, you know, two, three minutes to look at him. There was nothing between me and him. He wasn’t wearing a mask. Just like looking at anybody in here today. If I looked at you for two minutes, and you had a gun pointed at me, I’m going to remember what you looked like.”
(R. 105.) Tidwell further testified that he was “100 percent sure” that Windsor was the person who had robbed the CVS store when he was presented with a photographic lineup by Cpl. Barbaree. Tidwell also made an in-court identification of Windsor.
In addition to the testimony of the employees present at the CVS store at the time of the robbery, the surveillance-cam *879 era video of the robbery was played for the jury.
The State also presented evidence regarding a prior incident in which Windsor jumped over the counter of the pharmacy department at a Walgreens store. The State presented the testimony of Jennifer Bradshaw and Frances Crumwell, employees of Walgreens. The State also presented testimony from Tanja Walker, who witnessed Windsor’s flight from the Wal-greens store. The incident at Walgreens occurred on July 16, 2008, when Windsor jumped over the counter of the pharmacy department and demanded OxyContin. Crumwell was a pharmacist on duty, and her description of the events is indicative of the testimony of the other two witnesses. Crumwell testified as follows:
“[Crumwell]: It was about 9:45, because I was working until 10:00 that night. We were getting ready to close. We was doing our closing procedures. And one of my techs, I heard her say, you don’t — you are not supposed to be back here. And at that point in time I walked over to see what was going on. And I saw someone standing there. And they said, I want Oxycontin. And I said, well, if you’ll go back out front, I’ll get your prescription. He said, I don’t have a prescription. I want your Oxycontin.
“At that point I said, you need to get out of my pharmacy. He took a step toward me. And one of my other techs came between us. And then he jumped over the counter
“[PROSECUTOR]: Did he leave at that point?
“[Crumwell]: Yes, Sir.
[[Image here]]
“[PROSECUTOR]: Did the individual, did [he] ever give you a name for a prescription?
“[Crumwell]: No. The only thing that [he] said was that [he] wanted Oxycontin.
“[PROSECUTOR]: And you asked [him] if [he] would give you the prescription and you would get it?
“[Crumwell]: Correct. Because we have a waiting area, which we take, and we counsel people and whatnot. And he said he didn’t have a prescription. He wanted the Oxycontin.
“[PROSECUTOR]: And did he ever tell you a name or anything for a prescription that may have been dropped off earlier?
“[Crumwell]: No, sir, not to my recollection.
“[PROSECUTOR]: All right. Now, do you know who that individual was, or do you see them in the courtroom today? I know it’s been a couple of years.
“[Crumwell]: Yes, it certainly resembles the person that was back in the pharmacy.
“[PROSECUTOR]: And can you point out the person that you recognize?
“(Witness complies [Crumwell pointed toward Windsor].)”
(R. 137-38.)
In addition to the testimony from the Walgreens employees and Walker, Cpl. Barbaree — who also investigated the prior incident at Walgreens — testified that after Windsor was apprehended, Windsor voluntarily stated that he had jumped the counter at Walgreens in an unsuccessful attempt to steal some OxyContin and subsequently fled the scene. Cpl. Barbaree charged Windsor with obstruction of justice for using a false identity, because Windsor identified himself to police as Jeremy Windsor, not Montana Windsor.[1] However, Cpl. Barbaree did not charge *880 Windsor with any other crime stemming from the Walgreens incident.
Windsor testified in his own defense at trial. Windsor denied that he was the person who had robbed the CVS store. Windsor testified, however, regarding the events at the Walgreens store. Windsor admitted that he jumped over the pharmacy counter and demanded OxyContin.
Windsor’s case was tried before a jury. After both sides had rested and the circuit court had instructed the jury on the applicable law, the jury found Windsor guilty of robbery in the first degree. This appeal followed.
I.
Windsor first contends that the circuit court erred in allowing evidence of prior bad acts in violation of Rule 404(b), Ala. R. Evid. Specifically, Windsor argues that it was improper for witnesses to testify that in 2008 Windsor committed a similar crime when he jumped over the counter of the pharmacy department at a Walgreens and demanded OxyContin. During the trial, Windsor objected to all four of the witnesses who testified regarding the incident at the Walgreens store to the extent that those witnesses testified that Windsor jumped over the pharmacy counter at the Walgreens store and demanded OxyCon-tin.
“The admission or exclusion of evidence is a matter within the sound discretion of the trial court.” Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001). “The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-bad-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). See also Irvin v. State, 940 So.2d 331, 344-46 (Ala.Crim.App.2005).
Generally, “[ejvidence of any offense other than that specifically charged is prima facie inadmissible.” Bush v. State, 695 So.2d 70, 85 (Ala.Crim.App.1995) (citing Nicks v. State, 521 So.2d 1018 (Ala.Crim.App.1987)). However, the exclusionary rule operates to exclude only evidence of other crimes that is offered as proof of the defendant’s bad character. See Tyson v. State, 784 So.2d 328, 346 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000). Specifically, Rule 404(b), Ala. R. Evid., states, in pertinent part:
“(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....”
In Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005), this Court explained:
“In Robinson v. State, 528 So.2d 343 (Ala.Crim.App.1986), this Court discussed the purpose of the exclusionary rule, stating:
“ ‘ “ ‘On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.’ ” *881 Pope v. State, 365 So.2d 369, 371 (Ala.Crim.App.1978), quoting C. Gamble, McElroy’s Alabama Evidence 69.01 (3d ed.1977). “ ‘This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ ” Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting McElroy’s supra, 69.01(1). Thus, the exclusionary rule serves to protect the defendant’s right to a fair trial. “‘The jury’s determination of guilt or innocence should be based on evidence relevant to the crime charged.’ ” Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983); Terrell v. State, 397 So.2d 232, 234 (Ala.Cr.App.1981), cert. denied, 397 So.2d 235 (Ala.1981); United States v. Turquitt, 557 F.2d 464, 468 (5th Cir.1977).
“ ‘ “If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.” Saffold v. State, 494 So.2d 164 (Ala.Crim.App.1986). The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Crim.App.1984); Scott v. State, 353 So.2d 36 (Ala.Crim.App.1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. “ ‘Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.’” Averette v. State, 469 So.2d 1371, 1374 (Ala.Crim.App.1985), quoting United States v. Turquitt, supra at 468-69. “ ‘ “Prejudicial” is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.’ [Citation omitted.] ‘Of course, “prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.” ’ ” Averette v. State, supra, at 1374.’
“528 So.2d at 347. See also Hocker v. State, 840 So.2d 197, 213-14 (Ala.Crim.App.2002).”
940 So.2d at 345-46.
Two of the above mentioned exceptions to the exclusionary rule — identity and motive — are present in the instant *882 case. With regard to Rule 404(b) evidence used to prove identity, the Alabama Supreme Court has held: “[E]vidence of a prior crime is admissible only when the circumstances surrounding the prior crime and those surrounding the presently charged crime ‘exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person.’ ” Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985)(quoting Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.1983)). See also Irvin v. State, 940 So.2d 331, 345-52 (Ala.Crim.App.2005). With regard to Rule 404(b) evidence used to prove motive, this Court has stated: “[I]t is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.” Estes v. State, 776 So.2d 206, 210-11 (Ala.Crim.App.1999).
The record indicates that the circuit court did not abuse its discretion when it allowed testimony regarding Windsor’s actions at the Walgreens store because that evidence tended to prove both identity and motive. Windsor’s defense placed at issue his identity as the perpetrator of the crime at the CVS store. Windsor’s actions at the Walgreens store — namely, jumping over the pharmacy counter and demanding Ox-yContin — exhibited a very high degree of similarity to the robbery he later committed at the CVS store.
The evidence also demonstrated Windsor’s motive — as he demanded OxyContin and appeared to be under the influence of drugs during both incidents. This tended to show that Windsor’s motive for jumping over the pharmacy counter in both instances was because of his need for OxyContin. Because the Rule 404(b) evidence admitted against Windsor was not entered against him to prove his bad character, but was admitted in order to show identity and motive, the circuit court did not abuse its discretion when it allowed the State to present testimony about the 2008 incident at the Walgreens store.
II.
Windsor next contends that the circuit court erred when it failed to give the jury a limiting instruction with regard to the evidence of Windsor’s prior bad acts. Specifically, Windsor argues that the jury should have been instructed that the testimony about Windsor’s actions at the Wal-greens store should have been considered only to prove motive, opportunity, intent, preparation, knowledge, identity,' or absence of mistake or accident, and not to prove that Windsor acted in conformity with that character when he robbed the CVS Store.
As discussed in Part I, supra, Windsor objected to the testimony about the incident at the Walgreens store. Although Windsor did not request a limiting instruction with regard to that evidence at the time of the testimony, he did request prior to the jury beginning deliberations that the circuit court provide the jury with a limiting instruction:
“[Defense Counsel]: May I approach, Judge?
“THE COURT: Yes.
“(Whereupon, the following occurred at the bench out of the hearing of the jury.)
“[Defense Counsel]: We are entitled to 404—
“THE COURT: You didn’t give it to me. Mr. Bullard, you didn’t ask for it.
“[Defense Counsel]: I don’t have to ask for it.
“THE COURT: I’ll look at it. Do you wish to look at this [requested limiting instruction to be provided to the jury]?
*883 “[PROSECUTOR]: I’ve seen it.
“THE COURT: Any objections?
“[PROSECUTOR]: I object to it.
“THE COURT: I will not offer it. You may make an exception.
“[Defense Counsel]: Let the record know that I requested it.
“THE COURT: And I asked you for what you wanted before I began this charge and it was not brought forth at that time.
“[Defense Counsel]: I didn’t hear that, Judge.
“THE COURT: I understand. But it’s now denied. All right.
“(Whereupon, the following occurred in the hearing and presence of the jury.)
“THE COURT: So now is the time for you to begin your work. And if you will go on into the jury room and make your determination. The evidence will be gathered up and given to you.
“(Whereupon, the jury was excused to begin deliberations.)
“THE COURT: Any exception to the charge?
“[PROSECUTOR]: The State is satisfied.
“[Defense Counsel]: Yes, your Honor.
“THE COURT: You may give your exceptions.
“[Defense Counsel]: We would request the 404 charge and I’d like it to be made part of the record that we requested that charge. And we are entitled to a 404 charge. I’ve got it marked.
“THE COURT: Let me mark the denial on it. And we’ll make it for your record purposes. And in the future, Mr. Bullard, when I ask if there is anything further for the Court, I would expect any charges that you want to go to be given.
“[Defense Counsel]: All I can do is apologize.
“THE COURT: You don’t have to apologize. It interrupts the flow.
“[Defense Counsel]: I was sure you were going to give the charge anyway.
“THE COURT: Well, you’ve made your objections on the record in regard to the 404 ruling.
“[Defense Counsel]: Thank you, Your Honor.”
(R. 288-85.) As the above exchange indicates, Windsor has preserved this issue for review on appeal.
 Windsor is correct in his assertion that the circuit court abused its discretion by failing to provide the requested limiting instruction. As the Alabama Supreme Court discussed in Ex Parte Billups, 86 So.3d 1079, 1085 (Ala.2010):
“In Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), the United States Supreme Court stated that, when evidence of a defendant’s other crimes, wrongs, or acts is introduced under Rule 404(b), Fed.R.Evid., ‘the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.’ 485 U.S. at 691-92, 108 S.Ct. 1496 (citing United States v. Ingraham, 832 F.2d 229, 235 (1st Cir.1987)(emphasis added)).”
Here, the circuit court erred in refusing to instruct the jury as to the limited purpose for which the evidence of Windsor’s prior bad acts was admitted after such an instruction was requested by Windsor.
Nevertheless, we conclude that the admission of the testimony regarding the 2008 incident at the Walgreens store without a limiting instruction, although error, was harmless error. The harmless-error rule provides, in pertinent part:
“No judgment may be reversed or set aside ... on the ground of ... improper *884 admission or rejection of evidence, ... unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
Rule 45, Ala. R.App. P.
In Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003), this Court stated:
“ ‘The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless.’ Whitehead v. State, 777 So.2d 781, 847 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001), citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
“ ‘After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was. Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]; Sattari v. State, 577 So.2d 535 (Ala.Crim.App.1990), cert. denied, 577 So.2d 540 (Ala.1991); [Ala.] R.App. P. 45 .... In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict and/or sentence. In order for a non-constitutional error to be deemed harmless, the appellate court must determine with “fair assurance ... that the judgment was not substantially swayed by the error.” Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); Vines v. United States, 28 F.3d 1123, 1130 (11th Cir.1994).... In order for the error to be deemed harmless under Ala. RApp. P. 45, the state must establish that the error did not or probably did not injuriously affect the appellant’s substantial rights_The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.’
“Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).”
889 So.2d at 666.
Our review of the record in the instant case indicates that beyond the testimony regarding the Walgreens incident, the State presented overwhelming evidence of Windsor’s guilt. Three CVS employees who were present at the time of the robbery clearly and unequivocally identified Windsor as the man who robbed the CVS store. Video taken by a surveillance camera in the store depicted Windsor, whose appearance was not obscured, robbing CVS. Finally, Windsor’s former employer identified Windsor from the same video surveillance footage as the perpetrator of the crime. Therefore, in light of the evidence presented at trial and the totality of the circumstances, we conclude that the circuit court’s failure to instruct the jury on the limited purposes for which it could consider the evidence of the 2008 incident at the Walgreens store was harmless beyond a reasonable doubt.
III.
Finally, Windsor contends that the circuit court abused its discretion in sentencing him to 120 years’ imprisonment. Specifically, Windsor argues that his sentence is excessive because the maximum sen *885 tence under § 13A-5-9(b)(3), Ala.Code 1975, is “not less than 99 years or a maximum of life imprisonment.” (Windsor’s brief, p. 34.)
“ ‘Review on appeal is restricted to questions and issues properly and timely raised at trial.’ Newsome v. State, 570 So.2d 703, 717 (Ala.Crim.App.1989). ‘An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented.’ Pate v. State, 601 So.2d 210, 213 (Ala.Crim.App.1992). ‘“[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.” ’ McKinney v. State, 654 So.2d 95, 99 (Ala.Crim.App.1995) (citation omitted) .... ‘The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury.’ Ex parte Works, 640 So.2d 1056, 1058 (Ala.1994).”
Ex parte Coulliette, 857 So.2d 793, 794-95 (Ala.2003).
In the instant case, Windsor raises his argument that his sentence is excessive for the first time on appeal. At the time of his sentencing, the following exchange occurred:
“THE COURT: I’m going to sentence you to a hundred and twenty years in the State penitentiary. There is a case that allows that. Do you have anything to say before the Court before I reaffirm this sentence?
“[Windsor]: May God’s will be done.
“THE COURT: That is all you have to say?
“[Windsor]: Yes, sir.”
(R.S. 6.) In his motion for a new trial, Windsor asserted the above-discussed claims under Rule 404(b), Ala. R.Crim. P., but Windsor made no objection to the length of sentence imposed by the circuit court. Because Windsor did not raise his excessive-sentence claim with the circuit court, this claim is not preserved for review on appeal.
Moreover, even if Windsor had preserved this claim for appeal, he would not be entitled to relief. Section 13A-5-9(b), Ala.Code 1975, provides, in pertinent part:
“In all cases when it is shown that a criminal defendant has been previously convicted of any two felonies and after such convictions has committed another felony, he or she must be punished as follows:
[[Image here]]
“(3) On conviction of a Class A felony, he or she must be punished by imprisonment for life or for any term of not less than 99 years.”
The Alabama Supreme Court interpreted the meaning of “by imprisonment for life or for any term not less than 99 years” in Lane v. State, 66 So.3d 824 (Ala.2010), holding:
“[W]e conclude that the phrase ‘for any term of not less than 99 years’ means that the sentencing options for a defendant with two prior felony convictions who is sentenced pursuant to the HFOA are a minimum sentence of 99 years, a maximum sentence of life imprisonment, and any term of years between the minimum and the maximum, i.e., any term in excess of 99 years. Lane was sentenced to 120 years; therefore, his sentence is within the prescribed statutory range of punishment.”
66 So.3d at 829-30.
In the instant case, as in Lane, Windsor was sentenced under § 13A-5-9(b), Ala.Code 1975, to 120 years’ imprisonment because Windsor was a habitual felony offender who had committed a Class *886 A felony after having committed two prior felonies. As such, Windsor’s sentence is indistinguishable from the sentence imposed in Lane, a sentence that was upheld as within the permissible statutory range by the Alabama Supreme Court. “When a sentence imposed by the trial court is within the minimum and maximum range provided by our statutory law, this court will not overturn the sentence unless there is clear abuse by the trial court.” Sparks v. State, 665 So.2d 996, 997 (Ala.Crim.App.1995).
At sentencing, the circuit court explained its basis for the sentence imposed on Windsor as follows:
“Mr. Windsor, it’s because of people like you that we have plexi-glass shields between merchants and their customers to prevent injury to their employees and to the general public.
“You demonstrated that drugs are your obsession. And I don’t see that stopping. I’m going to sentence you to a hundred and twenty years in the State penitentiary.”
(R.S. 6.) Because the record indicates that the circuit court did not abuse its discretion in imposing this sentence, and because the sentence imposed on Windsor was within the statutory range of punishment, Windsor is not entitled to relief on his claim that his sentence is excessive.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
WINDOM, P.J., and BURKE and JOINER, JJ., concur.
WELCH, J., dissents, with opinion.

. Jeremy is Montana Windsor's brother.